1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   SHIRLEY RENEE MARTIN,

11             Plaintiff,                    No. 2:12-cv-0033-KJN

12        v.

13   MICHAEL J. ASTRUE,
     Commissioner of Social Security,

14
             Defendant.                     ORDER
15   _____/

16             Plaintiff seeks judicial review of a final decision of the Commissioner of Social

17   Security ("Commissioner") denying plaintiff's application for Supplemental Security Income

18   ("SSI") under Title XVI of the Social Security Act ("Act").[1]  In her motion for summary

19   judgment, plaintiff principally contends that the Commissioner erred by finding that plaintiff was

20   not disabled from April 29, 2009, the date that her SSI application was filed, through the date of

21   the final administrative decision.  (Dkt. No. 18.)  The Commissioner filed an opposition to

22   plaintiff's motion and a cross-motion for summary judgment.  (Dkt. No. 21.)  Thereafter, plaintiff

23   filed a reply brief.  (Dkt. No. 24.)  For the reasons that follow, the court denies plaintiff's motion

24   _____

25        [1]  This case was referred to the undersigned pursuant to E.D. Cal. L.R. 302(c)(15) and
     28 U.S.C. § 636(c), and both parties voluntarily consented to proceed before a United States
26   Magistrate Judge.  (Dkt. Nos. 6, 9.)

                                              1

1    for summary judgment, grants the Commissioner's cross-motion for summary judgment, and

2    enters judgment for the Commissioner.

3    I.      BACKGROUND

4            Plaintiff was born on April 7, 1958, has a high school education, and does not

5    have past relevant work.[2]  (Administrative Transcript ("AT") 26-27, 33, 128, 132.)  On April 29,

6    2009, plaintiff applied for SSI, alleging that she was unable to work as of July 1, 2006, primarily

7    due to a stroke, high blood pressure, and difficulties with her vision and balancing.  (AT 17, 68,

8    72, 128, 137, 140.)  Plaintiff had been in a long-term abusive relationship and also alleged

9    depression and anxiety attributable to post-traumatic stress disorder.  (AT 48-49, 175.)  On

10   August 24, 2009, the Commissioner determined that plaintiff was not disabled.  (AT 68.)  Upon

11   plaintiff's request for reconsideration, the determination was affirmed on January 28, 2010.  (AT

12   72.)  Thereafter, plaintiff requested a hearing before an administrative law judge ("ALJ"), which

13   took place on November 10, 2010.  (AT 17, 30.)

14           In a decision dated December 21, 2010, the ALJ determined that plaintiff had not

15   been under a disability, as defined in the Act, from the SSI application date of April 29, 2009,

16   through the date of that decision.  (AT 17-28.)  The ALJ's decision became the final decision of

17   the Commissioner when the Appeals Council denied plaintiff's request for review on November

18   10, 2011.  (AT 1-6.)  Thereafter, plaintiff filed this action in federal district court on January 5,

19   2012, to obtain judicial review of the Commissioner's final decision.  (Dkt. No. 1.)

20   II.     ISSUES PRESENTED

21           Plaintiff has raised the following issues: (1) whether the ALJ improperly

22   evaluated the medical opinion evidence concerning plaintiff's physical and mental limitations;

23   (2) whether the ALJ erroneously failed to include social functioning limitations in plaintiff's

24   _____

25       [2]  Because the parties are familiar with the factual background of this case, including
     plaintiff's medical history, the court does not exhaustively relate those facts in this order.  The
26   facts related to plaintiff's impairments and medical history will be addressed insofar as they are
     relevant to the issues presented by the parties' respective motions.

1    residual functional capacity ("RFC"); and (3) whether the ALJ erred at step five by relying on the

2    "Grids" and failing to obtain vocational expert ("VE") testimony.[3]

3    III.    LEGAL STANDARD

4           The court reviews the Commissioner's decision to determine whether (1) it is

5    based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in

6    the record as a whole supports it.  Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).

7    Substantial evidence is more than a mere scintilla, but less than a preponderance.  Connett v.

8    Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted).  It means "such relevant evidence

9    as a reasonable mind might accept as adequate to support a conclusion."  Orn v. Astrue, 495 F.3d

10    625, 630 (9th Cir. 2007), quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).  "The

11    ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and

12    resolving ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citation

13    omitted).  "The court will uphold the ALJ's conclusion when the evidence is susceptible to more

14    than one rational interpretation."  Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

15    IV.    DISCUSSION

16        A.    Summary of the ALJ's Findings

17           The ALJ evaluated plaintiff's entitlement to SSI pursuant to the Commissioner's

18    standard five-step analytical framework.[4]  At the first step, the ALJ concluded that plaintiff had

19

20       [3]  Although plaintiff's briefing raised these issues in a different order, the court addresses

21    them in an order that more logically comports with the sequential evaluation process employed in
social security cases.

22       [4]  Disability Insurance Benefits are paid to disabled persons who have contributed to the

23    Social Security program. 42 U.S.C. §§ 401 et seq.  Supplemental Security Income is paid to
disabled persons with low income. 42 U.S.C. §§ 1382 et seq. Both provisions define disability,

24    in part, as an "inability to engage in any substantial gainful activity" due to "a medically
determinable physical or mental impairment. . . ."  42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A).

25    A parallel five-step sequential evaluation governs eligibility for benefits under both programs.
See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S.

26    137, 140-42, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:

not engaged in substantial gainful activity since April 29, 2009, plaintiff's SSI application date.

(AT 19.)  At step two, the ALJ determined that plaintiff had the following medically severe

combination of impairments: history of stroke, left eye visual loss, hypertension, history of

kidney disease, borderline intellectual functioning, organic mental disorder, posttraumatic stress

disorder, depression, and a history of polysubstance abuse.  (Id.)  However, at step three, the ALJ

determined that plaintiff did not have an impairment or combination of impairments that meet or

medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Id.)

> Before proceeding to step four, the ALJ assessed plaintiff's RFC as follows:

> After careful consideration of the entire record, I find that the
> claimant has the residual functional capacity to perform medium
> work as defined in 20 CFR 416.967(c) except she cannot engage in
> tasks requiring good binocular vision or depth perception and
> should avoid hazards, such as heights and heavy machinery.  She is
> limited to work involving no more than simple repetitive tasks.

(AT 21.)

////

---

> Step one:  Is the claimant engaging in substantial gainful
> activity?  If so, the claimant is found not disabled.  If not, proceed
> to step two.
> Step two:  Does the claimant have a "severe" impairment?
> If so, proceed to step three.  If not, then a finding of not disabled is
> appropriate.
> Step three:  Does the claimant's impairment or combination
> of impairments meet or equal an impairment listed in 20 C.F.R., Pt.
> 404, Subpt. P, App.1?  If so, the claimant is automatically
> determined disabled.  If not, proceed to step four.
> Step four:  Is the claimant capable of performing his past
> work?  If so, the claimant is not disabled.  If not, proceed to step
> five.
> Step five:  Does the claimant have the residual functional
> capacity to perform any other work?  If so, the claimant is not
> disabled.  If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

    The claimant bears the burden of proof in the first four steps of the sequential evaluation
process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the
burden if the sequential evaluation process proceeds to step five.  Id.

1    At step four, the ALJ found that plaintiff had no past relevant work.  (AT 26.)

2  Finally, at step five, the ALJ determined, in reliance on the "Grids" (see 20 C.F.R. Part 404,

3  Subpart P, Appendix 2), that, considering plaintiff's age, education, work experience, and RFC,

4  there were jobs that existed in significant numbers in the national economy that plaintiff could

5  perform.  (AT 27.)  Accordingly, the ALJ concluded that plaintiff had not been under a disability,

6  as defined in the Act, from plaintiff's SSI application date of April 29, 2009, through the date of

7  the ALJ's decision.  (AT 28.)

8    B.    Plaintiff's Substantive Challenges to the Commissioner's Determinations

9         1.    Whether the ALJ improperly evaluated the medical opinion evidence

10              concerning plaintiff's physical and mental limitations

11    The weight given to medical opinions depends in part on whether they are

12  proffered by treating, examining, or non-examining professionals.  Holohan v. Massanari,

13  246 F.3d 1195, 1201-02 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).

14  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater

15  opportunity to know and observe the patient as an individual.  Id.; Smolen v. Chater, 80 F.3d

16  1273, 1285 (9th Cir. 1996).

17    To evaluate whether an ALJ properly rejected a medical opinion, in addition to

18  considering its source, the court considers whether (1) contradictory opinions are in the record;

19  and (2) clinical findings support the opinions.  An ALJ may reject an uncontradicted opinion of a

20  treating or examining medical professional only for "clear and convincing" reasons.  Lester,

21  81 F.3d at 830-31.  In contrast, a contradicted opinion of a treating or examining professional

22  may be rejected for "specific and legitimate" reasons.  Lester, 81 F.3d at 830.  While a treating

23  professional's opinion generally is accorded superior weight, if it is contradicted by a supported

24  examining professional's opinion (supported by different independent clinical findings), the ALJ

25  may resolve the conflict.  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing

26  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  The regulations require the ALJ to

1   weigh the contradicted treating physician opinion, Edlund, 253 F.3d at 1157,[5] except that the ALJ

2   in any event need not give it any weight if it is conclusory and supported by minimal clinical

3   findings.  Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (treating physician's conclusory,

4   minimally supported opinion rejected); see also Magallanes, 881 F.2d at 751.  The opinion of a

5   non-examining professional, without other evidence, is insufficient to reject the opinion of a

6   treating or examining professional.  Lester, 81 F.3d at 831.

7           In this case, although the record includes some treatment notes and records, none

8   of plaintiff's treating physicians submitted detailed assessments concerning plaintiff's functional

9   limitations.  Accordingly, the parties' briefing primarily focuses on the opinions of the various

10  consultative examiners and state agency physicians.  The court separately addresses the issues

11  raised by plaintiff with respect to evaluation of plaintiff's physical and mental limitations.

12                                    *Physical Limitations*

13          Plaintiff argues that the ALJ improperly rejected the January 14, 2007 opinion of

14  consultative examiner and internal medicine specialist, Dr. Jenna Brimmer, by failing to include

15  balancing limitations in the RFC.  Dr. Brimmer diagnosed plaintiff with high blood pressure and

16  a history of stroke, resulting in a left eye visual deficit and disequilibrium.  (AT 202.)  She

17  assessed no exertional limitations, but opined that plaintiff was "not able to participate in

18  activities requiring binocular vision.  She should also avoid activities requiring climbing or

19  balancing because of her disequilibrium."  (Id.)

20          Plaintiff's argument lacks merit, because the ALJ specifically acknowledged

21  plaintiff's balancing limitations and accounted for them by including a restriction for hazards,

22  such as heights and heavy machinery, as well as lifting and carrying restrictions.  (AT 21, 25-26.)

23  SSR 85-15 states, in part, that:

24  _____

25       [5]  The factors include: (1) length of the treatment relationship; (2) frequency of
     examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis;
26   (5) consistency; (6) specialization.  20 C.F.R. § 404.1527.

> Limitations in *climbing and balancing* can have varying effects on the occupational base, depending on the degree of limitation and the type of job.  Usual everyday activities, both at home and at work, include ascending or descending ramps or a few stairs and maintaining body equilibrium while doing so.  These activities are required more in some jobs than in others, and they may be critical in some occupations.  Where a person has some limitation in climbing and balancing and it is the only limitation, it would not ordinarily have a significant impact on the broad world of work. Certain occupations, however, may be ruled out; e.g., the light occupation of construction painter, which requires climbing ladders and scaffolding, and the very heavy occupation of firefighter, which sometimes requires the individual to climb poles and ropes. Where the effects of the person's actual limitations of climbing and balancing on the occupational base are difficult to determine, the services of a VS may be necessary.

SSR 85-15, at *6.

Although plaintiff argues that Dr. Brimmer opined that plaintiff could not engage in *any balancing whatsoever*, and that the RFC therefore does not capture that more severe limitation, plaintiff's interpretation of Dr. Brimmer's opinion is inconsistent with Dr. Brimmer's clinical findings.  During her examination, Dr. Brimmer noted that while plaintiff had difficulty walking heel-to-toe, she had no difficulty generally moving about the exam room, or on and off the exam table, and she "does not walk with her hands outstretched or bump into items in this unfamiliar environment."  (AT 200.)  Dr. Brimmer further opined that plaintiff did not require an assistive device.  (AT 202.)  Plaintiff herself reported to Dr. Brimmer that she could dress herself, perform her own hygiene, cook, do dishes, mop, and vacuum, all of which involve some basic balancing requirements.  (AT 199.)  Therefore, the ALJ's interpretation and translation of Dr. Brimmer's opinion, in the context of her report as whole, was reasonable.

Furthermore, plaintiff's extreme interpretation is also inconsistent with other substantial evidence in the record.  On April 3, 2007, plaintiff's treating neurologist, Dr. Eileen Bardolph, found plaintiff's gait as well as toe, heel, and tandem walking to be normal.  (AT 441-42.)  Subsequently, on July 23, 2009, consultative examiner and internal medicine specialist, Dr. Satish Sharma, observed that plaintiff's gait was normal and that although she had brought a

1    walking cane with her, plaintiff could walk across the room without it.  (AT 228-29.)  Finally, on

2    August 6, 2009, plaintiff also denied any issues with balance or coordination to consultative

3    examiner and psychiatrist, Dr. Wong, who noted that plaintiff walked with no observable

4    abnormality of gait.  (AT 238-39.)[6]

5           Therefore, the court finds that the ALJ did not reject Dr. Brimmer's opinion, but

6    instead adequately accounted for plaintiff's balancing limitations in the assessed RFC.

7                                    *Mental Limitations*

8           Plaintiff next contends that the ALJ improperly rejected the opinions of Drs.

9    Wong, Carlson, Wakefield, and Kalman with respect to plaintiff's mental limitations.

10          On January 25, 2008, plaintiff was evaluated by consultative examining

11   psychologist, Dr. James Wakefield.  (AT 203-06.)  Dr. Wakefield found plaintiff to be oriented

12   and cooperative with normal appearance, adequate grooming, appropriate affect, normal speech,

13   adequate verbal skills, and normal thought content.  (AT 204.)  However, Dr. Wakefield

14   administered intelligence and memory tests, which revealed deficient intellectual ability, some

15   concentration and memory deficits, and a possible organic disorder.  (AT 204-06.)

16          Dr. Wakefield diagnosed plaintiff with an organic mental disorder, provisional

17   borderline intellectual functioning, a history of abuse, and a GAF score of 65.[7]  (AT 206.)  He

18

19          [6] As the ALJ noted, although plaintiff also testified that she frequently fell or passed out,
     the medical records only document a few instances where plaintiff sought treatment for such
20   incidents.  (AT 24.)  A presyncopal episode in June 2010 was attributed by her treating providers
     mainly to dehydration and a dental infection.  (AT 611.)  Furthermore, during a subsequent
21   November 2010 incident, when plaintiff presented with possible stroke-type symptoms and high
     blood pressure, she admitted to having used marijuana, cocaine, and tobacco, and her laboratory
22   tests were positive for cocaine.  (At 716-17.)  Treatment notes at times also noted plaintiff
     running out of blood pressure medication and otherwise poor compliance with hypertension
23   control.  (AT 605, 607-08, 728.)  Therefore, it was reasonable for the ALJ to conclude that
     plaintiff's alleged frequent falls or fainting episodes were likely the result of factors other than a
24   more persistent medical condition.  (AT 24.)

25          [7] GAF is a scale reflecting "psychological, social, and occupational functioning on a
     hypothetical continuum of mental health-illness."  Diagnostic and Statistical Manual of Mental
26   Disorders 34 (4th ed. 2000).  A GAF score of 61-70 indicates "[s]ome mild symptoms (e.g.,

1   opined that plaintiff could follow simple work rules, although more complex procedures would

2   present difficulties.  (Id.)  Dr. Wakefield stated that plaintiff's persistence and verbal

3   concentration were adequate, but that her pace and visual concentration were deficient.  (Id.)  He

4   further opined that plaintiff's ability to reason and make occupational, personal, and social

5   decisions in her best interests was deficient, although he also found that her social and behavioral

6   functioning was appropriate and that she could interact with co-workers, supervisors, and the

7   public at a minimally acceptable level.  (Id.)  Dr. Wakefield stated that plaintiff was not able to

8   handle her own funds.  (Id.)

9         Thereafter, on August 6, 2009, plaintiff underwent an evaluation by consultative

10   examining psychiatrist, Dr. Patrick Wong.  (AT 238-42.)  Dr. Wong reviewed plaintiff's prior

11   records, including the evaluation by Dr. Wakefield.  (AT 238.)  Plaintiff informed Dr. Wong that

12   she had not had any previous psychotherapy or psychiatric treatment.  (Id.)  She reported that she

13   had her purse snatched a few days before, causing her to be fearful in public and experience night

14   sweats.  (Id.)  Plaintiff also reported that she graduated from high school, was not enrolled in

15   special education classes, and that she was previously in a long-term relationship with some

16   domestic violence, but she claimed to have no resulting posttraumatic symptoms, indicating that

17   she felt positive about moving forward with her life.  (AT 239.)  Dr. Wong noted that plaintiff

18   was well groomed and conventional in appearance, without any asymmetric weakness; was

19   oriented; had fluent speech; was generally cooperative and friendly, exhibiting good social

20   reciprocity; and was without hypervigilance, motor tension, or agitation.  (Id.)  Although

21   plaintiff's mood was mildly worried/depressed, she had a full affect without excessive anxiety;

22   linear and organized thought form; normal thought content; an intact fund of knowledge; intact

23   judgment; some insight; good attention; and intact concentration.  (Id.)  She was able to spell a

24

25   depressed mood and mild insomnia) OR some difficulty in social, occupational, or school
functioning (e.g., occasional truancy, or theft within the household), but generally functioning

26   pretty well, has some meaningful interpersonal relationships."  Id.

1   word forwards and backwards, write a sentence, and perform simple calculations.  (Id.)  Memory

2   exercises and tests revealed that plaintiff's short and long term memory were intact.  (AT 239-

3   40.)

4          Dr. Wong diagnosed plaintiff with an adjustment disorder, secondary to the recent

5   purse snatching assault; depression;  "rule out acute stress disorder"; "rule out posttraumatic

6   stress disorder"; "rule out cognitive disorder"; "rule out borderline intellectual functioning"; and

7   a GAF of 60-70.  (AT 240.)  Dr. Wong observed that plaintiff exhibited minimal, but possible,

8   organic findings; that her level of functioning and educational history suggested functionality

9   somewhat superior to that found by Dr. Wakefield; and that plaintiff's capacity for simple, basic

10  work was not impaired by any borderline intellectual functioning.  (Id.)  Dr. Wong opined that

11  plaintiff's ability to carry out simple instructions was intact; her ability to carry out complex

12  instructions was generally intact; her ability to maintain an adequate pace and level of endurance

13  over an eight-hour workday was mildly reduced by her adjustment disorder and mild depression;

14  her ability to relate to co-workers and the public was mild to moderately diminished; her ability

15  to take instructions from a supervisor was generally intact; the probability of functional

16  deterioration due to typical workplace stressors was mildly elevated; her stress tolerance was

17  mildly diminished; her ability to adapt to a workplace was generally intact; and she was capable

18  of staying consistently aware of workplace safety issues.  (Id.)  She was also capable of managing

19  her own funds.  (Id.)

20         Subsequently, on January 26, 2010, state agency psychiatrist, Dr. Carlson,

21  reviewed plaintiff's records and opined that plaintiff was moderately limited in her ability to

22  understand, remember, and carry out detailed instructions; work in coordination with or

23  proximity to others without being distracted by them; interact appropriately with the general

24  public; and get along with coworkers or peers without distracting them or exhibiting behavioral

25  extremes.  (AT 284-85.)  He found plaintiff to be not significantly limited in all other areas.  (Id.)

26  Dr. Carlson summarized his findings by noting that plaintiff would have moderate difficulty with

1    detailed and complex work and in interacting with others, but otherwise had minimal difficulties.

2    (AT 286.)

3           Finally, on November 5, 2010, at the request of plaintiff's counsel, plaintiff was

4    examined by psychiatrist, Dr. Les Kalman, who also reviewed plaintiff's prior records.  (AT 629-

5    40.)  Plaintiff was tearful and complained of frequent, severe nightmares and flashbacks related

6    to her prior abusive relationship.  (AT 630.)  She stated that she was estranged from her family,

7    had no friends, and mostly stayed in her room watching TV.  (AT 632.)  However, plaintiff

8    indicated that she was able to do her own cooking, shopping, and housekeeping; care for her

9    personal hygiene; manage her own transportation; and pay bills.  (Id.)  She denied ever using

10   drugs or alcohol.  (AT 631.)  Dr. Kalman found plaintiff to be groomed with a normal posture,

11   pleasant and cooperative, alert and oriented, and with normal speech and good eye contact.  (AT

12   630-31.)  In terms of memory, she was able to recall two of three objects at five minutes; was

13   able to repeat five digits forward and three backward; and recalled two of the past five U.S.

14   presidents.  (AT 631.)  Although she could not do serial 3's, she was able to add, subtract,

15   multiply, and do basic calculations involving money.  (Id.)  Dr. Kalman noted that her

16   abstractions were not intact, but her insight and judgment were fair.  (Id.)  Plaintiff had a

17   depressed mood and a constricted affect, and was hypervigilant, although her thought process

18   was logical and goal directed without mood swings and emotional lability.  (AT 632.)

19          Dr. Kalman diagnosed plaintiff with post traumatic stress disorder, major

20   depression, and a history of abuse, and assessed a GAF of 48.[8]  (AT 632.)  Dr. Kalman found

21   plaintiff to be competent to manage her own funds and not significantly limited in her ability to

22   remember locations and work-like procedures; understand and remember short and simple

23   repetitive instructions or tasks; perform activities within a schedule, maintain regular attendance,

24   _____

25          [8] A GAF of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe
     obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or
     school functioning (e.g., no friends, unable to keep a job).  Diagnostic and Statistical Manual of
26   Mental Disorders 34 (4th ed. 2000).

1    and be punctual with customary tolerances; sustain an ordinary routine without special

2    supervision; ask simple questions or request assistance from supervisors; maintain socially

3    appropriate behavior and adhere to basic standards of neatness and cleanliness; respond

4    appropriately to changes; be aware of and take precautions regarding hazards; travel in unfamiliar

5    places and with public transportation; and set goals and make plans independently of others.  (AT

6    633, 635-37.)  He opined that plaintiff was mildly limited in her ability to carry out short and

7    simple instructions or tasks; maintain attention and concentration for extended periods; work in

8    coordination with or proximity to others without being unduly distracted by them; get along with

9    co-workers or peers without unduly distracting them or exhibiting behavioral extremes; and

10   interact appropriately with the general public or customers.  (AT 636-37.)  He further opined that

11   plaintiff was moderately limited in her ability to understand, remember, and carry out detailed

12   instructions or tasks; and that plaintiff was markedly impaired in her ability to accept instructions

13   and respond appropriately to criticism from supervisors.  (Id.)  Finally, Dr. Kalman stated that

14   work-related stressors would increase plaintiff's level of impairment and that she would be

15   unable to complete a workday more than three or four times per month.  (AT 637-38.)  He listed

16   the onset date of these limitations as 1998.  (AT 638.)

17        Contrary to plaintiff's contention, the ALJ did not reject the opinions of

18   consultative examining psychiatrist Dr. Wong and state agency psychiatrist Dr. Carlson.  The

19   ALJ gave substantial weight to their opinions, and consistent with those opinions, acknowledged

20   that plaintiff had moderate social functioning limitations and at least mild limitations in

21   concentration, persistence, or pace, leading to some difficulties with detailed and complex tasks.

22   (AT 20, 26.)  While there is a separate issue, addressed below, as to whether social functioning

23   limitations were appropriately incorporated into plaintiff's RFC, there is no indication that the

24   ALJ rejected Dr. Wong's or Dr. Carlson's opinion.

25        By contrast, the ALJ discounted some portions of Dr. Wakefield's and Dr.

26   Kalman's opinions.  Nevertheless, for the reasons discussed below, the court finds that the ALJ

1   provided specific and legitimate reasons for doing so.

2           The ALJ stated that he gave reduced weight to Dr. Wakefield's opinion, because it

3   was not consistent with the other medical evidence, especially given that plaintiff showed

4   adequate memory, attention, and concentration in subsequent evaluations.  (AT 26.)  Indeed, both

5   Dr. Wong's and Dr. Kalman's subsequent mental examinations revealed only mild deficits in

6   plaintiff's memory, attention, and concentration, and plaintiff's potential borderline intellectual

7   functioning was found to, at most, mildly affect her ability to perform simple, repetitive tasks.

8   (AT 240, 635-37.)  In this regard, the ALJ reasonably relied on these opinions over the opinion of

9   Dr. Wakefield, because Dr. Wong and Dr. Kalman evaluated plaintiff during the relevant period

10  at issue (which began in April 2009 when plaintiff applied for SSI[9]), whereas Dr. Wakefield

11  evaluated plaintiff more than a year earlier in January 2008.  (AT 203-06, 238-42, 629-40.)  The

12  ALJ also referenced Dr. Wong's specific opinion that plaintiff's actual functional ability

13  appeared to be superior to that indicated by Dr. Wakefield's test results.  (AT 26, 240.)  This

14  conclusion is supported by the fact that plaintiff graduated from high school without any

15  enrollment in special education classes.  (AT 239.)

16          Plaintiff argues that Dr. Wong's opinion should be entitled to less weight,

17  because, unlike Dr. Wakefield, who administered the Wechsler Adult Intelligence Scale, the

18  Wechsler Memory Scale, and other objective tests, Dr. Wong only performed a "basic

19  examination."  (Dkt. No. 18-1 at 17.)  However, even though Dr. Wong did not perform the same

20  tests that Dr. Wakefield performed, Dr. Wong's report shows that he conducted a thorough

21  mental examination, and that he specifically tested plaintiff's attention, concentration, memory,

22  and intellectual functioning through a variety of different exercises and tests.  (AT 239-40.)

23  _____

24          [9] Regardless of the alleged disability onset date, SSI is not payable prior to the month
    following the month in which the application was filed.  20 C.F.R. § 416.335.  Although plaintiff
25  alleged disability as of July 1, 2006, and the ALJ considered the entire record concerning
    plaintiff's medical history, it was reasonable for the ALJ to give greater weight to evaluations
26  performed during the relevant period for which benefits were potentially payable.  (AT 17.)

1   Moreover, Dr. Wong had access to Dr. Wakefield's prior test results and was able to consider

2   them as part of his overall evaluation.  Additionally, as noted above, Dr. Kalman, who also had

3   access to Dr. Wakefield's prior test results, made findings similar to those of Dr. Wong, at least

4   with respect to plaintiff's memory, attention, concentration, and intellectual functioning.

5   Therefore, substantial evidence supports the ALJ's weighing of Dr. Wakefield's opinion.

6          The ALJ also gave reduced weight to Dr. Kalman's opinion; in particular, to his

7   findings that plaintiff was markedly impaired in her ability to accept instructions and respond

8   appropriately to criticism from supervisors, and that she would be unable to complete a workday

9   more than three or four times per month.  (AT 26, 637-38.)  The ALJ reasoned that the opinion

10  was inconsistent with Dr. Kalman's own report, which indicated that plaintiff only had mild or

11  no significant limitations in most areas, including all other areas of social functioning.  (AT 26.)

12  Although plaintiff argues that her history of abuse, and Dr. Kalman's observations that plaintiff

13  was hypervigilant and fearful of future harm by her former significant other (AT 632), could

14  support such a limitation, Dr. Kalman never explained why these factors would so uniquely

15  affect plaintiff's relationships with supervisors, as opposed to her other social relationships.

16  Even though plaintiff told Dr. Kalman that she was estranged from her family and had no friends

17  (id.), that does not necessarily suggest that plaintiff is unable to interact appropriately with

18  supervisors in a work environment.  Dr. Kalman's report is also somewhat inconsistent in that

19  regard, because, in another portion of his report, Dr. Kalman found plaintiff to be not

20  significantly limited in her ability to ask simple questions or request assistance from supervisors.

21  (AT 636.)  Furthermore, Dr. Kalman assessed plaintiff as not significantly limited in her ability

22  to perform activities within a schedule, maintain regular attendance, and be punctual with

23  customary tolerances, which again contradicts his unexplained assertion that plaintiff would be

24  unable to complete a workday more than three or four times per month.  (AT 636, 638.)

25         Additionally, the ALJ noted that Dr. Kalman's findings were also inconsistent

26  with the other opinion evidence in the record.  (AT 26.)  As noted above, Dr. Wong found

1    plaintiff to be cooperative and friendly, exhibiting "good social reciprocity." (AT 239.) He

2    opined that plaintiff's ability to take instructions from a supervisor was generally intact. (AT

3    240.) Even Dr. Wakefield found plaintiff to be cooperative, and opined that she was able to

4    interact with co-workers, supervisors, and the public at a minimally acceptable level. (AT 204,

5    206.) Accordingly, the undersigned finds that the ALJ also provided specific and legitimate

6    reasons to discount Dr. Kalman's opinion.

7                    2.    Whether the ALJ erroneously failed to include social functioning

8                          limitations in plaintiff's RFC

9            Having determined that the ALJ's evaluation of the medical opinion evidence was

10   supported by substantial evidence, the court next considers whether the ALJ appropriately

11   translated plaintiff's supported limitations into the RFC. In this case, plaintiff contends that the

12   ALJ, despite finding that plaintiff suffered from moderate social functioning limitations, erred by

13   only restricting plaintiff to simple repetitive tasks in the RFC assessment.

14           An ALJ may synthesize and translate assessed limitations into an RFC assessment

15   without necessarily repeating each functional limitation verbatim in the RFC assessment.

16   Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1173-74 (9th Cir. 2008); see also 20 C.F.R. §

17   404.1545 (defining RFC as "the most you can still do despite your limitations"). Moderate

18   mental limitations are not necessarily inconsistent with an RFC for simple repetitive tasks, as

19   long as such an assessment is generally consistent with the concrete restrictions identified in the

20   medical evidence. Stubbs-Danielson, 539 F.3d at 1174; see also Rogers v. Comm'r of Soc. Sec.

21   Admin., 2012 WL 2951414, at *2 (9th Cir. 2012) (unpublished) (holding that an RFC assessment

22   for simple routine tasks, which did not expressly note the claimant's moderate social functioning

23   limitations, nonetheless adequately accounted for such limitations, because they did not result in

24   concrete work-related limitations preventing the claimant from performing simple routine tasks

25   involved in unskilled jobs).

26   ////

Here, despite concluding that plaintiff had certain mild to moderate social limitations, Dr. Wong found that plaintiff's ability to carry out simple instructions was intact, and even her ability to carry out complex instructions was generally intact.  (AT 240.)  Dr. Kalman also found that plaintiff's ability to carry out short and simple instructions was only mildly limited, and even Dr. Wakefield found that plaintiff could follow simple work rules.  (AT 206, 636.)  The concrete restrictions in the opinion evidence therefore support the ALJ's RFC assessment.  Additionally, because unskilled jobs "ordinarily involve dealing primarily with objects, rather than with data or people," moderate social functioning limitations are not as significant in such jobs.  SSR 85-15, at *4.

Moreover, even if the ALJ were technically required to include moderate social functioning limitations in the RFC, any such error was harmless.  The Ninth Circuit held that moderate mental limitations do not even require vocational expert testimony.  Hoopai v. Astrue, 499 F.3d 1071, 1077 (9th Cir. 2007).  In Hoopai, a medical source determined that the claimant was moderately limited in "his ability to maintain attention and concentration for extended periods; his ability to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerance; and his ability to complete a normal workday and workweek without interruption from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods."  Id.  After the ALJ utilized the Grids at step five to determine that the claimant was not disabled, plaintiff contended on appeal that the ALJ was required to seek vocational expert testimony regarding the limitations assessed.  Id. at 1075.  The Ninth Circuit rejected that argument, holding that such moderate mental limitations were not sufficiently severe to prohibit the ALJ from relying on the Grids without the assistance of a vocational expert.  Id. at 1077.

For these reasons, the ALJ's RFC assessment was supported by substantial evidence in the record as a whole, and any error in failing to expressly note moderate social functioning limitations in the RFC was harmless.

1        3.     <u>Whether the ALJ erred at step five by relying on the Grids and failing to</u>

2                  <u>obtain vocational expert testimony</u>

3        Plaintiff contends that the ALJ erred in failing to seek vocational expert testimony

4 concerning plaintiff's social functioning and visual limitations.

5        The "Grids" take administrative notice of the numbers of unskilled jobs that exist

6 throughout the national economy at various functional levels.  20 C.F.R. Part 404, Subpart P,

7 Appendix 2, § 200.00(b).  "The ALJ can use the grids without vocational expert testimony when

8 a non-exertional limitation is alleged because the grids provide for the evaluation of claimants

9 asserting both exertional and non-exertional limitations.  But the grids are inapplicable when a

10 claimant's non-exertional limitations are sufficiently severe so as to significantly limit the range

11 of work permitted by the claimant's exertional limitations."  <u>Hoopai</u>, 499 F.3d at 1075 (citations

12 and quotation marks omitted).  In such a case, vocational expert testimony is required.  <u>Id.</u>

13        For the reasons discussed above, plaintiff's moderate social functioning

14 limitations were not sufficiently severe to require vocational expert testimony.  With respect to

15 plaintiff's vision impairment, resulting in an inability to "engage in tasks requiring good

16 binocular vision or depth perception" (AT 21), SSR 85-15 states, in part:

17              As a general rule, even if a person's visual impairment(s) were to
              eliminate all jobs that involve very good vision (such as working
18              with small objects or reading small print), as long as he or she
              retains sufficient visual acuity to be able to handle and work with
19              rather large objects (and has the visual fields to avoid ordinary
              hazards in a workplace), there would be a substantial number of
20              jobs remaining across all exertional levels.

21 SSR 85-15, at *8.  Plaintiff argues that this social security ruling is limited to visual acuity and

22 does not address depth perception.  However, even if that is the case, the weight of the record

23 evidence does not suggest that plaintiff's depth perception difficulties give rise to limitations

24 beyond a need to avoid hazards such as heights and heavy machinery.

25        For example, Dr. Brimmer noted on January 14, 2007, that plaintiff had "no

26 difficulty moving about the exam room or on and off the exam table.  She does not walk with her

1   hands outstretched or bump into items in this unfamiliar environment.  She is able to find the

2   door knob without groping.  She can write her name without difficulty." (AT 200.)  Plaintiff

3   reported to Dr. Brimmer that she could dress herself, perform her own hygiene, cook, do dishes,

4   mop, and vacuum, although she sometimes missed things because of her vision.  (AT 199.)

5   Subsequently, on November 5, 2010, plaintiff similarly told Dr. Kalman that she was able to do

6   her own cooking, shopping, and housekeeping; manage her own transportation; and care for her

7   personal hygiene.  (AT 632.)

8           As the ALJ observed, these activities suggest that plaintiff is at least capable of

9   working with larger objects and avoiding more ordinary hazards in the workplace.  (AT 27.)  To

10  account for plaintiff's depth perception difficulties, the ALJ included a restriction for heights and

11  heavy machinery, but also correctly observed that such a restriction does not have a significant

12  impact on the number of jobs at any exertional level.  (Id.); see SSR 85-15, at *8.  Therefore, the

13  ALJ reasonably determined that plaintiff's vision deficits, including her limited depth perception,

14  were not sufficiently severe so as to significantly limit the amount of medium level jobs

15  available,[10] and no vocational expert testimony was required.

16  V.    CONCLUSION

17          For the foregoing reasons, IT IS HEREBY ORDERED that:

18          1.  Plaintiff's motion for summary judgment (Dkt. No. 18) is DENIED.

19          2.  The Commissioner's cross-motion for summary judgment (Dkt. No. 21) is

20  GRANTED.

21  ////

22  ////

23

24          [10]  According to the Grids, "[t]he functional capacity to perform medium work includes
    the functional capacity to perform sedentary, light, and medium work.  Approximately 2,500

25  separate sedentary, light, and medium occupations can be identified, each occupation
    representing numerous jobs in the national economy which do not require skills or previous
    experience and which can be performed after a short demonstration or within 30 days."  20

26  C.F.R. Part 404, Subpart P, Appendix 2, § 203.00(a).

3.  Judgment is entered for the Commissioner.

IT IS SO ORDERED.

DATE:  February 12, 2013

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE